

# In the
# Missouri Court of Appeals
# Western District

<table>
<tr><td>

**BRADLEY M. ROBERTSON<br>INDIVIDUALLY AND AS NEXT<br>FRIEND FOR OLIVIA Y. ROBERTSON,**

**Appellant,**

v.

**LORNA NELSON,**

**Respondent.**

</td><td>

**WD79278**

**OPINION FILED:**

**OCTOBER 25, 2016**

</td></tr>
</table>

**Appeal from the Circuit Court of Adair County, Missouri<br>The Honorable Thomas P. Redington, Judge**

**Before Division One: Anthony Rex Gabbert, P.J., Thomas H. Newton, and Alok Ahuja, JJ.**

Bradley M. Robertson (Father) appeals the circuit court's modification of paternity judgment on Father's "Motion to Modify as to Child Support" and Lorna Nelson's (Mother) "Counter-Motion to Modify." Father asserts ten points on appeal. First, he contends that the circuit court erred in changing physical custody with regard to Father's and Mother's child because there was insufficient evidence that a change in the circumstances of the child or her custodian occurred. Second, Father contends that the circuit court erred in changing physical custody regarding the child because it was against the weight of the evidence that a change in physical custody was in the child's best interest. Third, Father contends that the circuit court erred in changing legal custody because there was insufficient evidence a change in the

circumstances of the child or her custodian occurred. Fourth, Father contends that the court erred in admitting evidence of facts that predate the prior judgment. Fifth, Father contends that the court erred in restricting his parenting time because there was insufficient evidence that unrestricted contact would endanger the child's physical health or impair her emotional development and it was against the weight of the evidence that restricted parenting time was in the child's best interest. Sixth, Father claims that the circuit court erred in ordering a graduated visitation regime because it erroneously applied the law in that child visitation may only be modified upon a showing that the modification is in the child's best interest and the trial court's parenting plan automatically modifies future visitation without first finding the modification is in the child's best interest based on the circumstances then existing. Seventh, Father contends that the court erred in failing to award him any overnight holiday, vacation, or weekday parenting time because it was against the weight of the evidence to award him such limited parenting time in that he has a positive relationship with the child and is entitled to frequent, meaningful and continuing contact. Eighth, Father argues that the circuit court erred in imputing income of $2,000 per month to him because there was insufficient evidence Father is able to earn that sum of money in that his qualifications, employment potential, and the available job opportunities in the community showed he could only earn minimum wage. Ninth, Father contends that the circuit court erred in failing to award him a credit on Line 2C of Form 14 because the court erroneously applied the law in that Father was entitled to a credit on Line 2C for a son of Father's that primarily resided with Father since before the prior judgment. Tenth, Father claims that the circuit court erred in failing to modify his child support downward because it was against the weight of the evidence that Father showed a substantial and continuing change in

2

circumstances such that the terms of the prior judgment as to child support were unreasonable. We affirm in part and reverse in part.

## Factual and Procedural Background

Olivia Robertson (the child) was born March 28, 2011, to Father and Mother. On December 5, 2013, the circuit court entered a Judgment and Declaration of Paternity and Order of Child Custody and Support. Therein the court declared Father to be the child's biological father, incorporated the parties' Joint Parenting Plan, and established child support based on the parties' agreement within the Joint Parenting Plan. The Joint Parenting Plan awarded the child's legal and physical custody jointly to both parents. Mother was to "have physical custody of the minor child at all times except those times when Mother and Father agree it is in the best interests of the minor child to have visits with Father." However, in the event the parents could not agree, Father was to have parenting time every other weekend from 5:00 p.m. Friday until 10:00 a.m. Monday, and in alternate weeks from 5:00 p.m. Sunday to 10:00 a.m. Monday. Father received four nonconsecutive weeks of parenting time in the summer and the parties shared holidays with the child. Father's child support was calculated to be $548 per month, however the parties considered this unjust and inappropriate and agreed to Father paying $400 per month.

On August 20, 2014, less than nine months after the paternity judgment, Father filed a "Motion to Modify as to Child Support." He alleged therein that his former employer, Jim Robertson's Chevrolet, sold the business to Kirksville Motor Company, and that Kirksville Motor Company subsequently terminated Father's employment. He alleged that he had been unsuccessful in seeking alternative employment and that his sole source of income was from unemployment benefits.

On September 12, 2014, Mother filed an answer to that motion and on November 3, 2014, filed a Counter-Motion to Modify requesting a modification of custody. Mother alleged that, on October 25, 2014, Father was arrested and charged with the class B felony of Distribution/Manufacturing a Controlled Substance with the Intent to Distribute and the class D felony of Unlawful Use of Drug Paraphernalia. A Guardian ad Litem was appointed to represent the best interests of the child.

The court heard evidence on November 2 and November 19, 2015. In issuing its Judgment the court made the following findings which are not disputed on appeal:

> A search warrant was executed on [Father's] home on October 24, 2014. The Police searched his home and garage. In the garage they found substantial evidence of the manufacturing of methamphetamine, including numerous HCL generators, used to make meth. At least one of the HCL generators tested positive for meth. In the home they found a 'secret room' built off the master bedroom, filled with equipment and materials to grow marijuana. [Father] told the police he used the items to grow tomatoes. In Court he testified that he was "just thinking" about growing marijuana because he thought someday it might be legal. Neither explanation was credible. He denied any knowledge of the meth lab but admitted that he had 'blacked out' the windows to the garage because he didn't like people 'snooping.' He testified that it must have been [another named individual] making meth in his garage. He said he had no idea a meth lab was in his garage, and gave an elaborate explanation as to why each meth making item was in his garage. His denials were not credible in light of Respondent's testimony. Respondent testified that she had seen Petitioner make and use meth, including times with [the named individual]. Respondent testified she left Petitioner when she asked him to promise to stop using meth. He refused.

> Petitioner is currently married to 'Dakota' who he admits has 'drug problems.' Petitioner's home is currently no place for a young child.

> Petitioner is not employed, by choice. He uses gifts from his parents to pay just enough child support so that his driver's license is not suspended. He testified that he could obtain employment, but chooses not to because after his child support is deducted, he would not have 'enough money for gas.'

4

## Standard of Review

We view the evidence in the light most favorable to the circuit court's judgment and will affirm the judgment unless there is no substantial evidence to support it, it is against the weight of the evidence, or it erroneously declares or applies the law. *Blanchette v. Blanchette*, 476 S.W.3d 273, 277-278 (Mo. banc 2015). We defer to the circuit court's credibility determinations. *Id.* at 278 n1.

## Points I and IV

In Father's first point on appeal he contends that the circuit court erred in changing physical custody with regard to the child because there was insufficient evidence that a change in the circumstances of the child or her custodian occurred in that the drug charges against Father were filed thirteen months prior to trial, those charges were dismissed, there was no evidence Father used drugs since the date of the prior judgment, there was no other evidence showing a change occurred, and there was no evidence any facts were unknown to the court at the time of the prior judgment. In his fourth point on appeal, Father contends that the circuit court erred in admitting evidence of facts that predate the prior judgment because it erroneously applied the law in finding that evidence relevant in that only facts arising since the date of the prior judgment are considered under Section 452.410, RSMo Cum. Supp. 2015, and there was no evidence any facts were unknown to the court at the time of the prior judgment. As Father's arguments regarding Points I and IV overlap, we discuss them together.

Pursuant to Section 452.410,

> the court shall not modify a prior custody decree unless … it finds, upon the basis of facts that have arisen since the prior decree or that were unknown to the court at the time of the prior decree, that a change has occurred in the circumstances of

5

the child or his custodian and that the modification is necessary to serve the best interests of the child.

"Before a custody decree can be modified, there must be a significant or substantial change in circumstances." *Scherder v. Sonntag*, 450 S.W.3d 856, 859 (Mo. App. 2014).

We first note that, the court's judgment, which includes numerous findings of fact that are uncontested on appeal, reveals on its face a significant change in circumstances arising after the prior decree, or that were unknown to the court at the time of the prior decree, of both Father and the child. The prior decree was entered on December 5, 2013. On October 24, 2014, less than eleven months after the prior decree was entered, Father's home and garage was found to contain substantial evidence of methamphetamine production. All of the items necessary to manufacture methamphetamine were found in Father's garage. These items included salt, filters, jars, Liquid Fire, drain cleaner, HCL generators, bottles with hoses coming out of the caps, Coleman Camp Fuel, lithium batteries and lithium battery strips removed from the batteries, Sudafed boxes and Sudafed pop-up blister backs, a still used for the manufacture of anhydrous ammonia, and a "cold pack" which can be used in the place of the anhydrous ammonia ingredient. Father admitted at trial that hoses found in the garage tested positive for methamphetamines. Father testified that the windows in the garage were blacked out so that people could not see into the garage and "snoop," however the garage was located quite a distance from a locked gate. Father testified that he was not manufacturing methamphetamines in his garage. When asked, "[i]f someone was, do you have any idea of who that might be?" he responded, "Yes, [D.C.]." Father testified that D.C. was roofing his house at the time and had access to his garage. When asked where D.C. was on the day Father was arrested, Father indicated that D.C. was incarcerated for possession of methamphetamine.

6

Father testified that he entered the garage approximately "every other day" and that the child had entered the garage as well when helping take out the trash. Father gave the court various explanations for the various items found within the garage. The court found Father's explanations for the presence of the drug-related items to lack credibility and believed Mother's testimony with regard to Father's drug involvement.

Mother testified that, when she lived with Father, Father "was doing marijuana" and "making meth." Mother testified that when he started "it was only supposed to be once every, maybe, four months or so," . . . "and then he started making it in the garage at least on a weekly basis." Mother testified that she left Father for that reason. She testified that she was breastfeeding the child and Father wanted her to quit breastfeeding as soon as possible so that Mother could participate in "smoking pot, smoking methamphetamine." She testified that, "When he figured out that I wasn't participating anymore, he wanted me out of the house . . . . That's why we were fighting so much, it [] was always a fight. You know, I'd try to pull him into doing things with his family, into doing normal things, and it was always on a timeline. That was always the priority." Mother testified that she had previously used methamphetamine herself and the last time she used methamphetamine was nine months prior to the child's birth. She testified that she had also used marijuana and the last time she used marijuana was just before she left Father's home. Mother testified that she believed "that me leaving him and taking [the child] would make him, you know, think differently, act differently."

On the same date that the methamphetamine evidence was found in Father's garage, equipment to grow marijuana was found concealed within Father's home. This equipment included a cabinet with a grow light, thermometer, a fan, a filter hose with duct work connecting it to the outside of the residence, chemicals, starter plugs, B.C. Grow, books called *Marijuana*

7

*Grow Basics* and *Marijuana Grow Saver*. A pill bottle for generic Adderall prescribed to Father was found inside the cabinet. Father told officers that the equipment was for growing tomatoes, but testified at trial that he had the materials because he had been considering growing marijuana. Marijuana smoking paraphernalia in the form of a "dugout" glass pipe and a "one-hitter" with a small amount of marijuana were found in the bathroom off the Father's master bedroom.

At trial Father acknowledged that his wife, whom Father testified that he was separated from but who lived with Father after the date of the prior decree and who had contact with the child, had a drug problem.[1] Father testified, however, that there was no justification for having any concerns about his wife having contact with the child because "she was living in the house previous and prior to the first agreement we signed off on."

We need not look further than the uncontested factual findings of the court to conclude that a substantial change in circumstances of Father and the child arose after the prior decree. Upon considering the drug related evidence, the trial court concluded that Father's home "is currently no place for a young child." Father does not dispute this conclusion but suggests on appeal that the court's ultimate decision to alter custody was necessarily against the weight of the evidence because the drug-related charges against him were dismissed. This argument has no merit. Evidence regarding dismissal of the charges was available for the court's consideration in determining whether a substantial change in circumstances had actually occurred and whether a change of custody was in the child's best interest. The court's factual findings and judgment were not based on the fact that charges were initially filed against Father and the court makes no

---

[1]Respondent alleges on appeal that Robertson and his wife are still married as Robertson had filed for dissolution but dismissed those filings.

8

reference to charges having been filed; the court's judgment was based on its own conclusions, after hearing all of the evidence, that Father's denials regarding knowledge of the manufacture of methamphetamine on his property were not credible, and that his testimony regarding the marijuana growing equipment was also implausible. The court found his testimony particularly incredible in light of Mother's testimony regarding her prior observation of Father's drug involvement.

Father suggests in several of his points on appeal, but specifically alleges in his fourth point on appeal, that it was error for the court to consider any evidence of his involvement with drugs that occurred prior to the date of the former custody decree. He contends that

> [a]ny drug use before the prior judgment does not constitute facts unknown to the trial court at the time of the prior judgment. There was no foundation for the modification court to find the original trial court was unaware of any facts after hearing the evidence on December 5, 2013. Further, Mother cannot claim that she and [Father] used drugs before the prior judgment and claim there is changed circumstances because [Father] used drugs after the prior judgment. If that were true then [Father] occupied the same position before and after the prior judgment.

First, there is no indication in the court's judgment that the court used the prior drug use as evidence of a change in the child or Father's circumstances after the initial decree; the court used the prior drug use evidence to assess Father's credibility with regard to his knowledge and likely involvement in the drug related activity that was discovered *after* the initial decree and that prompted the motion for change of custody.[2] Second, as Father recognizes, Section 452.410 allows the court to consider facts that were unknown to the court at the time of the prior decree. Father was clearly a party to the proceedings that resulted in the prior judgment as he initiated

---

[2]See *KJB v. CMB*, 779 S.W.2d 36, 39 (Mo. App. 1989), wherein we found that "[a]ny evidence of pre-dissolution abuse by father was relevant to evidence of post-dissolution abuse, and the children's welfare is the court's foremost consideration."

9

those proceedings by petitioning the court for an order of paternity and declaration of custody and support. There was no trial regarding custody as the initial judgment indicates that "the parties submit the cause to the Court upon the pleadings, affidavits and proof[.]" The court adopted the parties Joint Parenting Plan in its judgment.[3]

Father's argument on appeal, taken to its logical end, is that, even if the parties conceal facts relevant to a determination of the best interests of the child in a prior proceeding, the court cannot thereafter consider that information in a subsequent modification without first proving that the original trial court was unaware of those facts.[4] This contention is refuted by precedent. We have previously found in appeals alleging trial court error for the admission of evidence occurring prior to a custody decree premised on a parental stipulation that, the issue of custody was not previously litigated and, therefore, pre-decree evidence related to custody was "unknown" to the court pursuant to Section 452.410. *See Lapee v. Snyder*, 198 S.W.3d 172, 175 (Mo. App. 2006) (citing *KJB v. CMB*, 779 S.W.2d 36 (Mo. App. 1989)). The record here shows that the prior custody decree was premised on a parental stipulation and, therefore, the issue of custody was not previously litigated. Consequently, we deem any evidence regarding parental drug involvement occurring prior to the original judgment to have been "unknown" to the court.

---

[3]Robertson acknowledges in his Motion to Modify as to Child Support that "the Court entered a Judgment incorporating the parties' Joint Parenting Plan with regard to the parties' minor child[.]"

[4]We note that, Robertson does not argue that, at the time of the prior judgment, the circuit court was aware of his drug involvement and nevertheless concluded that the custody arrangement created by the parties was in the child's best interest; he argues that the court should not have considered any drug involvement prior to the original order unless the court first proved that it was unaware of this information at the time it made its original order. Even if the court had been aware of prior drug involvement and had still approved the custody plan, that knowledge would not have precluded the court from considering whether continued parental drug involvement represented a substantial change in circumstances.

"Trial courts must decide custody issues based solely on the evidence that the parties choose to present." *Soehlke v. Soehlke*, 398 S.W.3d 10, 20 (Mo. banc 2013). Mother testified that she witnessed Father use and manufacture methamphetamine up until the time she left Father on May 13, 2012. The child would have been one year old at the time. On May 25, 2012, less than two weeks after Mother left Father, Father petitioned the court for an order of paternity and declaration of custody and support. The parents ultimately submitted a custody stipulation to the court which the court accepted and, apparently, was given no reason by either party to reject. "Statute, and indeed human nature, dictate that biological parents are the presumed best custodians for a child." *Scott v. Scott*, 147 S.W.3d 887, 895 (Mo. App. 2004) (referencing Section 452.375, RSMo Cum. Supp. 2015). However, this presumption is rebuttable. *Id.* Had the parents divulged their drug related activity at the time the court considered the parents' custody agreement, the court might have found neither party to be suitable custodians for their very young child.

A mere ten months after the initial custody decree was entered in response to Father's motions, evidence of a meth lab in Father's garage and a marijuana growing operation in Father's bedroom was discovered. At the time of this discovery, the child was three and a half years old. It is reasonable to infer from this evidence that Father may not have altered his drug-related activity after the initial custody order, and that these behaviors have occurred for a significant portion of the child's young life.

We find substantial evidence in the record to support that a substantial change in circumstances of the child and Father occurred after the initial custody judgment thereby supporting the circuit court's decision to modify physical custody. Further, the court did not err

in admitting evidence of Father's drug related activity that occurred before the prior custody order.   Points one and four are denied.

**Point II**

In Father's second point on appeal he contends that the circuit court erred in changing physical custody because it was against the weight of the evidence that a change in physical custody was in the child's best interest in that the child was unaware of Father's arrest, the drug charges against Father were filed thirteen months prior to trial, those charges were dismissed, there was no evidence Father used drugs since the date of the prior judgment, there was no evidence of abuse, neglect or domestic violence, Father had been through a schedule of supervised visitation for a period of nine months, Father had passed each drug test given to him, and Father and the child have a positive relationship.

"The best interest of the child is not merely an important consideration in modification proceedings under section 452.410, it is the trial court's central concern." *Soehlke*, 398 S.W.3d at 15.

For the reasons set forth above, the fact that the drug charges against Father were dismissed is of no consequence in this case.  Further, the fact that the drug charges were filed thirteen months prior to trial is also of no consequence as the court found concerning not only the evidence of drug activity, but also Father's trial testimony regarding the drug related evidence that was found within his home or on his premises.  Father testified to alternate uses for each meth related ingredient found within his garage, and minimized the fact that he had a marijuana "grow locker" in his bedroom.  The court rejected Father's testimony as lacking credibility.  The fact that thirteen months passed between the time the drug-related items were discovered and the court heard the modification evidence does not change the fact that Father was still denying the

12

extent of his drug involvement at the time of trial. The fact that there was no evidence that Father used drugs since the date of the prior judgment is of no consequence because, even if he did not, all materials necessary to manufacture methamphetamine were found in his garage during a time that he admitted the child had access to and entered that garage. A sheriff's deputy testified that he had no doubt that methamphetamine was being manufactured in the garage. The deputy further testified that, the production of methamphetamine can "absolutely" be harmful to people that come into contact with that production.

It was not against the weight of the evidence for the court to find a change in physical custody to be in the child's best interest. Point two is denied.

**Point III**

In his third point on appeal Father contends that the circuit court erred in changing legal custody because there was insufficient evidence a change in the circumstances of the child or her custodian occurred in that the parties' communication was no worse at the time of trial compared to the time of the prior judgment and the child's mother and the Guardian ad Litem testified that Father should be involved in decision-making.

"'Under joint legal custody, the parents share the decision-making regarding the health, education and welfare of the child.'" *Pasternak v. Pasternak*, 467 S.W.3d 264, 273 (Mo. banc 2015) (quoting *Leone v. Leone*, 917 S.W.2d 608, 614 (Mo. App. 1996)). "'[T]he parents' ability to communicate and cooperate is crucial in considering whether joint legal custody is proper.'" *Id.* (quoting *Mehler v. Martin*, 440 S.W.3d 529, 536 (Mo. App. 2014)). "'If the parents are unable to make shared decisions concerning the welfare of the children, joint custody is not in the best interests of the children.'" *Pasternak*, 467 S.W.3d at 274 (quoting *Mehler*, 440 S.W.3d at 536.)

Father admits on appeal that the "parties testified they did not communicate well since the date of the prior judgment." When Father testified at trial regarding being behind in his child support, he was asked if he had provided other items for the child beyond the child support check. He said that he had not; he had not been asked and he had not offered. When asked why he had not taken the initiative he testified, "Because I can't hardly talk to [Mother] in any way, shape or form of anything in the first place." Mother testified that for more than a year prior to the court hearing, she received no telephone calls or personal communication from Father regarding the child. She did receive communication from his attorney during that time. The Guardian ad Litem testified that "I think there's little chance of – of cooperation in these parents going forward, and that situation, I think, is only going to get worse . . . I think that's the way it's going to be a for a very long time." The court stated to Mother at trial: "You know, this little girl needs both of you. I would hope that you would try to get along. While I hope that that's the case, I don't hold out much hope for that to happen, but time will tell."

We find substantial evidence in the record regarding the parents' inability to communicate and cooperate. Nevertheless, as with several other points on appeal, Father contends that there was no evidence that this lack of communication and cooperation was any different than at the time of the prior judgment, or that there were any facts unknown to the court at the time of the last judgment. As discussed above, this argument is without merit due to the prior judgment being based on a stipulation between the parents. Beyond this, the parents' prior ability to come to an agreement with regard to custody evidences that their ability to communicate and cooperate since that time has significantly deteriorated. Point three is denied.

**Point V**

In his fifth point on appeal Father contends that the circuit court erred in restricting his parenting time because there was insufficient evidence that unrestricted contact would endanger the child's physical health or impair her emotional development and it was against the weight of the evidence that restricted parenting time was in the child's best interest in that the child was unaware of Father's arrest, the drug charges against Father were filed thirteen months prior to trial, those charges were dismissed, there was no evidence Father used drugs since the date of the prior judgment, there was no evidence of abuse, neglect or domestic violence, Father had been through a schedule of supervised visitation for a period of nine months, Father passed each drug test given to him, and Father and the child have a positive relationship.

Pursuant to Section 452.400.1(1), RSMo Cum. Supp. 2015, "[a] parent not granted custody of the child is entitled to reasonable visitation rights unless the court finds, after a hearing, that visitation would endanger the child's physical health or impair his or her emotional development. The court shall enter an order specifically detailing the visitation rights of the parent without physical custody rights to the child …[.]"

"Every visitation agreement confines and limits the visitation of each parent within certain bounds." *Turley v. Turley*, 5 S.W.3d 162, 165 (Mo. banc 1999). Here, the court had to initially find a substantial change in circumstances of a custodial parent or the child to warrant modifying custody. Upon making that finding, the court changed custody from joint between the parents to sole physical and legal custody to Mother with visitation rights to Father. In so doing, the court was obligated pursuant to Section 452.400.1(1) to award Father "reasonable visitation

15

rights . . . unless visitation would endanger the child's physical health or impair his or her emotional development."

On appeal, Father argues that there was no evidence that unrestricted visitation would endanger the child's physical health or impair her emotional development. We disagree. There is ample evidence in the record with regard to Father's drug activity, and denials at trial regarding that activity, to support the court's conclusion that "Petitioner's home is currently no place for a young child." The court was under no obligation to believe Father's reformation averments and the court expressly found Father's averments to lack credibility.

At the time the evidence of drug activity was found on Father's premises, he enjoyed parenting time with the child at his home, and he also had a fourteen-year-old child from a previous relationship living with him. Father's denials at trial regarding the state of his premises when he had unsupervised contact with his child, and his failure to acknowledge that the premises posed a danger to his then three-year-old child, was sufficient evidence from which the court could conclude that unsupervised visitation posed a danger to the child. Father fails to prove how, given the evidence, the court's visitation schedule did not provide him with "reasonable visitation." Point five is denied.

**Point VI**

In his sixth point on appeal, Father contends that the circuit court erred in ordering a graduated visitation regime because it erroneously applied the law in that child visitation may only be modified upon a showing that the modification is in the child's best interest and the trial court's parenting plan automatically modifies future visitation without first finding the modification is in the child's best interest based on the circumstances then existing. We agree.

"[T]o [e]nsure protection of the children's best interest under section 452.400.1, a trial court is required to reevaluate the parties' situation before lifting a restriction placed on visitation when, at the time the restriction is imposed, the court cannot determine what will be in the children's best interest." *Lipic v. Lipic*, 103 S.W. 3d 144, 148 (Mo. App. 2003). There may, however, "be cases in which, at the time of the original order granting visitation, the court can determine what will be in the best interest of the children after a given period of restricted visitation." *Id.* Here, we find that the circuit court's visitation schedule for Father misapplied the law by lifting visitation restrictions without first reevaluating whether lifting those restrictions is in the best interest of the child.

The record reflects that, although under the December 5, 2013, custody agreement custody was designated as "Joint Physical Custody," Father and Mother agreed that Mother would "have physical custody of the minor child at all times except those times when Mother and Father agree is in the best interests of the minor child to have visits with Father." However, in the event the parties could not agree, Father was to have parenting time every other weekend from 5:00 p.m. Friday until 10:00 a.m. Monday, and in alternate weeks from 5:00 p.m. Sunday to 10:00 a.m. Monday. Father received four nonconsecutive weeks of parenting time in the summer and the parties shared holidays with the child. Although Father claims that Mother significantly restricted his parenting time with the child after Father's arrest, there is little evidence in the record indicating how much parenting time Father actually spent with the child prior to his October 24, 2014 arrest.

Father was arrested on October 24, 2014, and was charged with Manufacturing a Controlled Substance and Possession of Drug Paraphernalia. He was released from custody on October 30, 2014, on a personal recognizance bond. The following day he contacted Mother

17

indicating a desire to exercise his Halloween parenting time with the child.  Mother refused to allow Father contact due to Father's arrest.  The record reflects that, because Father understood Mother's concerns regarding his arrest, he agreed to supervised parenting time until his criminal charges were resolved.  The parties ultimately reached a temporary agreement providing Father with parenting time every Friday from 3:30 p.m. to 6:30 p.m., to be supervised by Father's parents.  Father's first visit pursuant to this agreement was on February 13, 2015, and this agreement remained in effect until the hearing on Father's motion to modify child support and Mother's counter-motion to modify custody.

The visitation schedule in the court's judgment sets forth a detailed, graduated visitation schedule.  It begins with three months of eight hour visits occurring twice per month.  These visits are to be supervised by Mother.  Then, for the following six months, Father receives three eight hour visits per month, to be supervised by Mother or another "supervising family" of Mother's choosing.  For six months after that, Father has the child from 7:30 p.m. on Friday until 6:00 p.m. on Saturday, twice per month.  Father is to provide a urinalysis and Breathalyzer two hours prior to each of these unsupervised visits, and is to pay for that testing and provide the results to Mother within two hours of obtaining them.

The above totals fifteen months of supervised visitation.  Thereafter, Father has unsupervised visitation every other weekend from Friday at 7:30 p.m. until Sunday at 5:00 p.m.  He is to provide a urinalysis and Breathalyzer two hours before each visit, and is to pay for that testing and provide the results to Mother within two hours of obtaining the results.

Father was ordered to sign a release for any future Drug or Alcohol treatment programs which he attends, allowing Mother "full access to verify attendance, meaningful participation and to obtain a discharge summary and to communicate with such provider or any other facility

or agency providing counseling, mental health treatment, or drug/alcohol treatment/testing to Father."

The Parenting Plan provides that, six months from the date of the Parenting Plan, but no more than once every three months, Father will submit to hair follicle tests at the request of Mother. Father is to submit to this testing within forty-eight hours of Mother's request. If Father fails to present himself as ordered, the test will be deemed positive.

The Parenting Plan provides that, until the child is emancipated, Mother shall have the right to request additional random urinalyses, or other drug/alcohol testing from Father, not to exceed once per month. Father is to respond to each urinalysis request within eight hours, and Mother is allowed to select the facility where the urinalysis is to be completed. Lack of compliance will be deemed a "failed" drug test.

The Parenting Plan provides that, upon any failed drug test, Father's visitation will terminate until he participates in an "in-patent" drug and alcohol program. Thereafter, the graduated visitation schedule that is set forth above will be reinstated and the process begins again.

We find that, while it was not unreasonable for the court to order supervised visitation given the evidence, the order for supervised visitation necessarily means that the court deemed unsupervised contact with Father to be against the child's best interests. The court's requirements regarding drug testing evidence that the court has grave concerns regarding Father's history of drug use and the safety of the child if that use continues. The visitation schedule set forth by the court here appears to be based on the reasonable conclusion that, if Father proves himself to be drug free for an extended period of time, there can be more confidence in assuming that unsupervised contact would not harm the child. *See Kroeger-*

19

*Eberhart v. Eberhart*, 254 S.W.3d 38, 47 (Mo. App. 2007). While the court did not believe Father's averments regarding his lack of knowledge of and/or involvement in activity related to methamphetamine occurring on his premises, this visitation schedule gives Father the benefit of the doubt by allowing redemption on the court's terms.

However, because of the justifiable supervised visitation restrictions placed on Father's visitation, the court must reevaluate whether lifting those restrictions is in the best interest of the child prior to doing so. *Lipic*, 103 S.W. 3d at 148. Given the history of this case, it is impossible to determine whether certain aspects of the Parenting Plan are in the child's future best interest. For example, while the Parenting Plan requirement that visitation shall cease upon a positive drug test is reasonable, it is impossible to determine now whether reinstating the graduated visitation plan after successful completion of inpatient treatment following a failed test would be in the best interest of the child at a future time. Further, the requirement that Father be subject to Mother's request for hair follicle tests and "random UA's, or other drug/alcohol testing from Father," to be completed in a specified amount of time at a facility selected by Mother, for roughly the next thirteen years, vests too much discretionary power with Mother. *See Pilger v. Pilger*, 972 S.W.2d 628 (Mo. App. 1998). Mother herself admitted to methamphetamine and marijuana use and we cannot prematurely conclude that, even now much less for the next thirteen years, Mother should have unfettered discretion and authority to monitor Father in this manner.

We conclude that the court misapplied the law by setting forth a Parenting Plan that lifted visitation restrictions without first reassessing the best interests of the child. As we have determined that the court's Parenting Plan also placed too much discretionary power with Mother, and recognize that the court's Parenting Plan may have been different without these

20

provisions, we remand to the circuit court for reconsideration of its visitation schedule. The court may choose to hear additional evidence regarding events that have transpired since the date of the court's prior judgment that may impact the court's consideration of the child's best interest. Point six is granted.

### Point VII

In Father's seventh point on appeal, he contends that the circuit court erred in failing to award him any overnight holiday, vacation, or weekday parenting time because it was against the weight of the evidence to award him such limited parenting time in that he has a positive relationship with the child and is entitled to frequent, meaningful and continuing contact.

For the reasons set forth above under Father's fifth point and regarding the court's justifiable visitation schedule, Father's seventh point on appeal is denied.

### Points VIII and X

In Father's eighth point on appeal, he contends that the circuit court erred in imputing income of $2,000 per month to him because there was insufficient evidence Father is able to earn that sum of money in that his qualifications, employment potential, and the available job opportunities in the community showed he could only earn minimum wage. In his tenth point on appeal Father contends that the trial court erred in failing to modify his child support downward because it was against the weight of the evidence in that Father showed a substantial and continuing change in circumstances such that the terms of the prior judgment as to child support were unreasonable. We find no error.

> The trial court has discretion to impute income to an unemployed parent. In doing so, the court must consider the relevant factors: (1) The parent's probable earnings based on the parent's work history during the three years, or such time period as may be appropriate, immediately before the beginning of the proceeding and during any other relevant time periods; (2) The parent's

21

occupational qualifications; (3) The parent's employment potential; (4) The available job opportunities in the community; and (5) Whether the parent is custodian of a child whose condition or circumstances make it appropriate that the parent not be required to seek employment outside the home. The record must support the amount imputed and the parent's capacity to earn that amount. We will not disturb a child support award unless the evidence is palpably insufficient to support it.

*Doss v. Brown*, 419 S.W.3d 784, 791 (Mo. App. 2012) (quoting *Monnig v. Monnig*, 53 S.W.3d 241, 245 (Mo. App. 2001) (internal citations and quotations omitted)). "[C]ourts may impute a higher income to a noncustodial parent than he or she actually earns, if the evidence shows that the parent has the capacity to earn more but voluntarily refuses to do so." *Walker v. Walker*, 936 S.W.2d 244, 247 (Mo. App. 1996).

Here, Father detailed cars for fifteen years for a car dealership, earning a high of $35,808 per year. Mother testified that, during the time that she was with Father, he earned in excess of $2,000 per month. Father's car dealership employment ended in May of 2014 and he collected unemployment for six months thereafter. In August of 2014, within three months of losing the car dealership employment, Father moved the court to reduce his child support obligation.

Although Father testified that, after losing his employment he sought work at places such as McDonalds, Taco Bell, and Orsheln's, he did not testify to applying for any jobs in his field of expertise.[5] The court found that

Petitioner is not employed, by choice. He uses gifts from his parents to pay just enough child support so that his driver's license is not suspended. He testified that he could obtain employment, but chooses not to because after his child support is deducted, he would not have 'enough money for gas.'

---

[5]Although Father claims on appeal that he "was unable to get back into the automobile detailing business," his testimony at trial was merely that he was unable to open a detailing business of his own because he was denied a business license due to prior felony convictions.

In short, the court found Father's averments regarding his failure to work to lack credibility. We defer to the court's credibility determinations. *Blanchette*, 476 S.W.3d at 278. Consequently, Father was not entitled to a reduction in his child support.[6] Further, there is sufficient evidence in the record to support the court's imputation of $2,000 per month income to Father. Points eight and ten are denied.

## Point IX

In his ninth point on appeal Father contends that the circuit court erred in failing to award him a credit on Line 2C of Form 14 because the court erroneously applied the law in that Father was entitled to a credit on Line 2C for a son of Father's that primarily resided with Father since before the prior judgment. Mother did not respond to this contention in her appeal brief. Mother conceded at oral argument, however, that Father was entitled to a Line 2C credit. Consequently, Father's ninth point on appeal is granted and we remand this issue to the circuit court for recalculation of Father's child support obligation.

## Conclusion

We conclude that: (1) There was sufficient evidence to support that a change in the circumstances of the child or her custodian occurred warranting a change in physical custody; (2) It was not against the weight of the evidence that a change in physical custody was in the child's

---

[6]Although Father contests the court's failure to reduce his child support from the amount ordered in the previous judgment, we note that, by stipulation of the parties, Father was ordered to pay $400 per month in the original judgment, not the presumed child support amount of $548. This agreement was based on the parties' conclusion that "the parties envision that Father will continue to provide in-kind support for the child when she is with him" and that "the child will benefit more from additional funds available to Father to permit him to continue to spend money directly on the child for her birthday, holidays, and other special occasions." We question whether these reasons would have warranted a conclusion that the presumed amount was unjust or inappropriate had the issue been litigated. We note, however, that the new amount Father has been ordered to pay, $435 per month based on an imputed income, is still $113 less per month than his presumed child support amount at the time he was fully employed.

23

best interest; (3) There was sufficient evidence that a change in the circumstances of the child or her custodian occurred warranting a change in legal custody; (4) The circuit court did not erroneously apply the law by admitting evidence of facts that predate the prior judgment; (5) The circuit court's visitation schedule was reasonable given the evidence; (6) The circuit court erred in ordering a visitation regime that lifted the supervised contact restrictions without first reassessing the best interest of the child, and by ordering Father subject to Mother's unfettered discretion to request drug testing from Father for the duration of the child's childhood; (7) The circuit court's parenting time award was not against the weight of the evidence; (8) The circuit court did not err in imputing income to Father of $2,000 per month; (9) The circuit court misapplied the law by failing to award Father a credit on Line 2c of the Form 14; and (10) The circuit court did not err in failing to reduce Father's child support.

We affirm the circuit court's judgment in part, reverse the portion of the court's judgment regarding Father's visitation schedule and the court's Form 14 calculation, and remand for further proceedings consistent with this opinion.

_____
Anthony Rex Gabbert, Judge

All concur.

24